# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-1728V

| | |
|---|---|
| STEPHANIE FELIX and ASHTON FELIX, on behalf of E.A.F., | Chief Special Master Corcoran |
| Petitioners, | Filed: April 29, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*John Leonard Shipley*, Davis, CA, for Petitioners.

*Mallori Browne Openchowski*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION[1]

      Stephanie and Ashton Felix, acting on behalf of their minor child E.A.F., have filed a Petition under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Program"), regarding E.A.F.'s development of immune thrombocytopenic purpura ("ITP") after receipt of a measles-mumps-rubella ("MMR") vaccine on August 6, 2018. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Based on a review of all submitted evidence and arguments, and for the foregoing reasons, I hereby **GRANT** Respondent's Motion to Dismiss the claim for failure to establish the statutory severity requirement. Resp. Motion to Dismiss (ECF No. 27), citing Section 11(c)(1)(D)(i). Accordingly, the claim is **DISMISSED.**

## I. Procedural History

On August 19, 2021, Petitioners initiated their claim "out of an abundance of caution with respect to the applicable statute of limitations." Petition (ECF No. 1) at ¶ 16. Petitioners subsequently obtained and filed supporting medical records, and an initial statement from Stephanie Felix, as Exhibits ("Exs.") 1 – 12. On May 13, 2022, Petitioners amended their petition in relevant part, clarifying that they alleged that E.A.F.'s ITP caused residual effects and complications lasting for more than six months. Amended Petition (ECF No. 18) at ¶ 15. The case was assigned to the SPU. Order (ECF No. 20).

On August 7, 2022, Respondent filed his Rule 4(c) Report (ECF No. 26) and a Motion to Dismiss the Claim for Failure to Satisfy the Severity Requirement (ECF No. 27). *See also* Section 11(c)(1)(D)(i). On December 5, 2022, Petitioners filed a supplemental statement from Stephanie Felix as Ex. 13 (ECF No. 29) and their Opposition to Respondent's Motion to Dismiss (ECF No. 30) ("Pet. Opp.").

I warned Petitioners that the existing record did not appear to establish six months' severity – but allowed them to file any additional fact evidence. Scheduling Order filed June 23, 2023 (ECF No. 33).[3] Petitioners filed three additional witnesses' statements. Exs. 14, 16 – 17,[4] followed by Petitioners' Brief on August 21, 2023 (ECF No. 37). Respondent filed a Response on October 18, 2023 (ECF No. 40). Petitioners filed a Reply on October 27, 2023 (ECF No. 41). The matter is ripe for adjudication.

## II. Medical Records

E.A.F. was born without complications in fall 2015, was generally healthy, and had an established pediatric care practice ("PCP"). *See generally* Exs. 6, 9, 10. E.A.F. was

---

[3] In opposing Respondent's motion to dismiss, Petitioners requested a further opportunity to file both fact evidence and/or an expert child psychiatrist/ psychologist's opinion. *See* Pet. Opp. At n. 3. But experts are not routine in SPU cases, *see* Scheduling Order filed May 20, 2022 (ECF No. 20) at 1. Petitioners were ordered to first seek statements from E.A.F.'s treaters and any other fact witnesses, and any other evidence that may be available, to establish the requisite factual foundation for their claim. Scheduling Order filed June 23, 2023 (ECF No. 33) at 2 – 3.

[4] All witness statements filed in the case were sworn under penalty of perjury. *See* 28 U.S.C.A. § 1746 (providing that such a declaration may be afforded "like force and effect" as an affidavit).

receiving vaccines on an alternative schedule. Ex. 6 at 76 (vaccination summary); *see also, e.g., id.* at 12, 24, 30, 32 (PCP records noting parents' instructions regarding vaccinations).

At a July 23, 2018, well-child visit, pediatrician Sarah Giguere, D.O., assessed E.A.F. with constipation and anemia due to high milk intake. Ex. 6 at 29. E.A.F. also received hepatitis A and varicella vaccines at this encounter. *Id.*

At an August 6, 2018, follow-up with Dr. Giguere, E.A.F. received the at-issue MMR vaccine. Ex. 6 at 32. Fifteen (15) days later, on August 21, 2018, Dr. Giguere saw E.A.F. on an urgent basis. Ex. 6 at 33. His mother recounted that E.A.F. had developed symptoms including "several bruises on his body over the past 24 – 48 hours after leaving school." *Id.* "CPS [child protective services] has been called and questioned him." *Id.*[5] Dr. Giguere's assessment was thrombocytopenia[6] potentially representing ITP, which should be further evaluated in a hospital emergency room. *Id.* at 34.

Accordingly, later that same day, the mother brought E.A.F. to the Rady Children's Hospital ("RCH") emergency room. Ex. 2 at 17. A complete blood count ("CBC") revealed a low platelet count of 7,000. *Id.* at 21. E.A.F. was assessed with "severe thrombocytopenia, likely acute ITP" and admitted to the hematology-oncology floor to receive IVIg. *Id.* at 23. After receiving one dose of IVIg, E.A.F.'s platelet count had risen to 20,000. *Id.* at 30, 49.

On August 22, 2018, at 12:00 a.m., Jenny Kim, M.D., a pediatric hematology-oncology fellow, assessed that E.A.F. was likely "Ok to [discharge] today with repeat [bloodwork] in 2 days. If [platelets] dropping or new bleeding [symptoms,] would repeat IVIg dose." Ex. 2 at 29.

The August 22, 2018, RCH discharge summary notes E.A.F.'s diagnosis of ITP, as well as mild anemia (attributed to his previously-noted high milk intake) for which he had been started on daily iron. Ex. 2 at 14. E.A.F. would "return to clinic on 8/24 for CBC check and iron studies. Would hold vaccines (except influenza vaccine) for at least 6 months after IVIg. He may not have full response to vaccines after recent IVIg administration." *Id.* Finally, the family was instructed to "avoid rough play." *Id.* at 15.

---

[5] Later that day, the mother recounted that Dr. Giguere "discussed CPS but thought mom should bring E.A.F. to the ED for further work-up." Ex. 2 at 17.

[6] Thrombocytopenia is defined as a decrease in the number of platelets. *Dorland's Medical Dictionary Online*, https://www.dorlandsonline.com/dorland/definition?id=49875&searchterm=thrombocytopenia (last accessed Apr. 24, 2024).

3

Repeat CBCs (all performed at RCH) revealed a platelet count of 140,000 on August 24, 2018;[7] 117,000 on September 17, 2018; 72,000 on October 11, 2018; and 90,000 on October 18, 2018. Those CBCs also tested E.A.F.'s iron levels. Ex. 2 at 47 – 52; Ex. 4 at 1 – 7.

Two months after the ITP onset and hospitalization, on October 22, 2018, Jennifer Han, M.D., a pediatric hematology-oncology fellow at RAH, saw E.A.F. for a single "routine follow-up." Ex. 2 at 49. Dr. Han reviewed the interim platelet counts (listed above), and the family's history of "No new petechiae. No severe bruising. Mild bruising to bilateral shins. Doing well overall in the interim." *Id.* Dr. Han assessed that E.A.F. was a "3 y.o. previously healthy male with ITP with overall stable platelet count and iron deficiency anemia that is improving on iron supplementation." *Id.* at 48. She offered the following plan: "Avoid aspirin and NSAIDs. Call clinic with bleeding symptoms. Call clinic prior to invasive procedures. Discharge from clinic. We also reviewed that he should not have any live vaccines for 6 – 12 months after IVIg, and no rough play while thrombocytopenic. Family expressed understanding and agreement with the plan. Labs with CBCd in 2 weeks. RTC [return to clinic] in 4 weeks for labs (CBC, diff, iron studies) and exam." *Id.*

Further CBCs (performed at RCH) revealed E.A.F.'s platelet count to be 166,000 on November 5, 2018; 225,000 on December 12, 2018; and 301,000 on April 1, 2019. Ex. 8 at 8, 10; Ex. 2 at 57. However, there were no further *evaluations* at RCH, or with any other medical provider, during this time period.

On April 4, 2019, the mother brought E.A.F. to an urgent care center for evaluation of a generalized rash, noting his prior history of ITP. Ex. 3 at 8. They were sent to pediatrician Stephanie Cone, M.D., who found a rapid strep test to be positive, assessed scarlet fever, and prescribed amoxicillin. Ex. 2 at 35 – 36.

On July 8, 2019, the pediatrician Dr. Giguere offered conservative management for E.A.F.'s symptoms of abdominal pain, decreased appetite, constipation, and an oral ulcer. Ex. 6 at 38 – 39. Dr. Giguere also assessed that E.A.F.'s spontaneous nose bleeds represented vasomotor rhinitis. *Id.* at 38

At an October 14, 2019, well-child visit, Dr. Giguere exempted E.A.F. from receiving future MMR vaccines, and recorded that someone had reported E.A.F.'s case to VAERS. Ex. 6 at 45. Dr. Giguere also assessed E.A.F. to be a "4 y.o. healthy male with

---

[7] A comment on the August 24, 2018, CBC reads: "The reported platelet count may be inaccurate due to platelet clumping. Platelets appear adequate on peripheral blood smear." Ex. 2 at 47.

4

normal growth and developmental milestones." *Id.* at 48. The only treatment provided was a prescription steroid for eczema. *Id.*

On March 23, 2020, pediatrician Karen S. Loper, M.D., evaluated E.A.F. for a recent history of cough, throat pain, and swollen lymph nodes. Ex. 6 at 51. He was assessed with strep A pharyngitis, to be treated with amoxicillin. *Id.* at 53.

On May 27, 2020, a pediatric nurse practitioner ("NP") administered E.A.F.'s second Hep B vaccine. Ex. 6 at 55 – 56. The NP noted both E.A.F.'s history of ITP, and a current "assessment and plan" of iron deficiency anemia secondary to inadequate iron intake, upon ordering a CBC. *Id.* Afterwards, a June 19, 2020, CBC found a platelet count of 297,000. Ex. 2 at 59.

On June 26, 2020, Dr. Giguere recorded that the mother wanted E.A.F. to receive "either polio or varicella" vaccine on that date. Ex. 6 at 58. After further discussion, E.A.F. received an inactivated polio vaccine ("IPV"). *Id.* Dr. Giguere also recorded that the last CBC was "completely normal" but "mom prefers to get CBC after every visit." *Id.* Afterwards, a July 7, 2020, CBC found a platelet count of 274,000. Ex. 2 at 60.

On July 24, 2020, Dr. Giguere administered a varicella vaccine to E.A.F., and recorded that his "vaccines [were] now UTD [up to date] for MMR exception for one year, school note provided." Ex. 6 at 64.

E.A.F. received urgent care for pharyngitis on July 31, 2020, and for an upper respiratory infection on October 9, 2020. Ex. 3 at 5 – 6, 10 – 12.

On April 8, 2021, E.A.F. received a DTaP vaccine at the pediatrics practice. *Id.* at 67. On May 17, 2021, Dr. Giguere saw E.A.F. for abdominal pain, constipation, and wheezing. *Id.* at 69 – 71. No further medical records have been filed.

### III. Sworn Statements

I have fully reviewed the sworn statements from E.A.F.'s mother (one of the co-Petitioners), grandmother, caregiver, and the aforementioned pediatrician Dr. Giguere.

To briefly summarize, the mother attests that RCH hematology team wanted to continue monitoring E.A.F.'s platelet counts, restrict physical activity, and restrict further vaccinations for at least six months after his August 2018 MMR vaccine and ITP acute course. Ex. 5 at ¶¶ 13, 15; Ex. 13 at ¶¶ 3 - 4. She recalls that an (unnamed) RCH hematologist repeated this advice in a November 2018 telephone call (although E.A.F.'s platelet count had normalized by that time). Ex. 5 at ¶ 17; Ex. 13 at ¶ 5. The family could

not obtain insurance coverage or otherwise afford further hematology appointments. Ex. 5 at ¶¶ 18, 21; Ex. 13 at ¶¶ 5, 8. However, the mother "kn[e]w that [E.A.F.'s] primary care doctor was speaking with the hematologist regarding his ongoing condition and monitoring of his condition." Ex. 5 at ¶ 21. She maintains that E.A.F.'s physical activity, receipt of further vaccines, and psychological health were negatively impacted for over six months, based on instructions from his treating providers. Ex. 5 at ¶¶ 22 – 24; Ex. 13 at ¶¶ 9 – 12.

The grandmother lives several hundred miles away but visited regularly. Ex. 16 at ¶ 2. As a longtime registered nurse with training in pediatrics, she "knew that it was critical [for E.A.F.] to avoid physical activity that could result in internal bleeding and all precautions should be taken." *Id.* at ¶ 3. The grandmother avers that for months, E.A.F.'s physical activity was restricted, and he wore a protective helmet which she believed was recommended by an unspecified doctor. *Id.* at ¶ 4 – 7.

The caregiver recalls taking "extraordinary steps to restrict E.A.F.'s activities to keep him safe," including "wear[ing] the helmet provided by his mother," for more than six months. *See* Ex. 14 at ¶¶ 6 - 9. E.A.F.'s ITP acute course and the subsequent restrictions impacted his physical, emotional, and mental development. *Id.* at ¶¶ 9 – 13.

Finally, Dr. Giguere recalls being E.A.F.'s "primary pediatrician at all times relevant to his treatment for ITP." Ex. 17 at ¶ 3. Dr. Giguere confirms that after seeing E.A.F. for administration of his MMR vaccine and tentatively assessing him with ITP in August 2018, she did not personally evaluate him for nearly a year. *Id.* at ¶¶ 4 – 9. Dr. Giguere does not attest that she or the pediatrics practice had any coordination of E.A.H.'s care with the RCH hematology team. *See generally* Ex. 17. But she avers:

> I understand that E.A.F.'s platelet levels returned to normal by November 5, 2018, and remained within the normal range for all subsequent testing. However, I viewed certain treatment and restrictions as medically prudent despite these test results. For example, I believe it was prudent to restrict E.A.F.'s physical interactions for the six (6) months following his ITP diagnosis. I do not think it would have been advisable to allow him to unnecessarily risk being injured by participating in potentially rough play with other kids during this timeframe. I also think it was necessary to restrict the vaccinations E.A.F. received for the six (6) months following his ITP diagnosis. Finally, I believe that it was prudent to delay E.A.F. receiving another MMR vaccine until June 26, 2020, as a result of his ITP diagnosis. I view all of these restrictions as part of his ongoing medical care, and sequela, from his ITP injury/ illness.

Ex. 17 at ¶ 12.

## IV. Parties' Arguments

Petitioners maintain that they can establish severity despite a relevant, recent Federal Circuit decision, *Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1005 (Fed. Cir. 2022), that suggests mere ongoing monitoring of ITP is not evidence of severity. *Wright,* they argue, turned on a treater's affirmative, specific assessment that the vaccinee's ITP had "resolved," even though treaters thereafter continued to monitor platelet levels. Pet. Opp. at 10; Pet. Brief at 4. Here, in contrast, despite E.A.F.'s platelet levels returning to normal, E.A.F.'s pediatrician Dr. Giguere avers that it was "medically prudent" to restrict his physical activity and vaccinations for more than six months, as part of his ongoing medical treatment for ITP. Pet. Opp. at 4 – 5. Petitioners further aver that the additional fact witnesses' statements demonstrate how these restrictions impacted E.A.F.'s physical and emotional development. *Id.* at 5. Petitioners therefore argue that they have established ITP residual effects and complications lasting for over six months.

In maintaining that severity is not met, Respondent emphasizes that all objective, contemporaneous evidence indicates that E.A.F.'s ITP resolved less than six months post-vaccination and onset. Resp. Response at 9. Even considering the additional sworn statements, there is not preponderant evidence that any physician ordered ongoing physical activity restrictions after E.A.F.'s platelet count had normalized. Resp. Response at 10. Hematologist Dr. Han's October 2018 note cautioned against rough play only "while thrombocytopenic," and that Dr. Giguere's 2023 statement "reads as a comment on the reasonableness of the course that was taken, and not a recitation of her real-time recommendation." *Id.* (internal citations omitted). The other witnesses' assessments are rebutted by the medical records, which indicate normal growth and development. Resp. Response at 10 – 11. "The record therefore demonstrates that to the extent Petitioners restricted E.A.F.'s activities after November of 2018, it was not medically directed or necessary. While these activities may have been motivated by well-meaning parental concern," they do not constitute "residual effects or complications" under Section 11(c)(1)(D)(i). *Id.* at 11, citing *Wright*, 22 F.4th at 1004.

## V. Applicable Legal Standards

In another recent decision, I discussed at length the legal standards governing the burden of proof for Table claims, the analysis of fact evidence, ruling on the record, and the six-month severity requirement at Section 11(c)(1)(D)(i) (both generally, and applying to ITP in particular). I hereby fully adopt and incorporate herein that discussion, in Sections IV and V of *Michie v. Sec'y of Health & Hum. Servs.*, No. 19-0453V, 2023 WL 10410004, at *4-10 (Fed. Cl. Spec. Mstr. Dec. 4, 2023). There, I noted that ITP's objective

hallmark is an abnormally low platelet count. *Michie*, 2023 WL 10410004, at *6; *see also* 42 C.F.R. § 100.3(c)(7) (providing that ITP "is defined by the presence of clinical manifestations, such as petechiae, significant bruising, or spontaneous bleeding, *and by a serum platelet count less than 50,000/mm³* with normal red and white blood cell indices") (emphasis added).

As previously emphasized, the Federal Circuit has established that under Section 11(c)(1)(D)(i), the phrase "residual effects" means "something remaining or left behind from a vaccine injury," that "never goes away or recurs after the original illness." *Wright*, 22 F.4th at 1005. The phrase "is focused on effects within the patient, particularly lingering signs and symptoms of the original vaccine injury." *Id.* at 1006. Put another way "[a] residual effect must be *a change within the patient* that is caused by the vaccine injury." *Id.* at 1001 (emphasis added).

## VI. Analysis

E.A.F. fortunately recovered from ITP well within six months after the August 2018 vaccination and onset and did not suffer any recurrence of that condition. Thus, E.A.F.'s parents face the not-uncommon challenge of establishing that this acute condition nevertheless caused "residual effects" rendering them eligible for compensation under the Act.

I find no reason to doubt Petitioners' explanation that they were unable to obtain insurance coverage or otherwise afford hematology evaluations after October 22, 2018. But shortly after that date, E.A.F.'s platelet level normalized – and never again objectively fell to levels consistent with ITP. And there is insufficient evidence of any medical provider's decision to maintain physical activity restrictions beyond that point. Most persuasive is the hematologist's previous, specific explanation that E.A.F. should be restricted from rough play "while thrombocytopenic." Ex. 2 at 48.[8] Of course, E.A.F. was never again thrombocytopenic.

It is also reasonable to presume that any ongoing restrictions would have been noted in contemporaneous medical records – but no such documentation exists. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) (holding

---

[8] The hospital's website explains further, in plain language:

> Thrombocytopenia is when there aren't as many normal platelets in the blood as there should be. Platelets… help the blood clot… Children with a low platelet count should take care to avoid injuries, especially to the head, because of the risk of bleeding.

Rady Children's Hospital, *Thrombocytopenia*, https://www.rchsd.org/health-article/thrombocytopenia/ (last accessed Apr. 26, 2024).

that medical records are generally given weight than later recollections); *see also Leming v. Sec'y of Health & Hum. Servs.*, 161 Fed. Cl. 744, 760 (2022) (explaining that a reliance on the contemporaneous medical records did not reflect "any lack of sincerity or bad faith on Ms. Leming's part in reporting what she understood Dr. Forbes' advice to be"), *not disturbed on appeal*, -- F.4th ----, 2024 WL 1608658 (Fed. Cir. 2024).

Dr. Giguere's later statement does not cure this deficiency in the claim. First, she does not attest to any particular expertise in treating ITP, or that she was coordinating with the hematology team on E.A.F.'s ongoing care. She also does not explain *why* it would be medically "prudent" or necessary to restrict the activity of a child whose repeat CBCs and clinical presentation were otherwise consistently recorded to be normal. And as Respondent observes, Dr. Giguere seems to endorse a course of conduct after the fact, rather than describe real-time medical instructions – which again, are not documented in the medical records. Again – well before expiration of the severity period, E.A.F. appears to have recovered from ITP, and it has not recurred. Ex. 6 at 48 (Dr. Giguere's medical record assessment that E.A.F. was "healthy… with normal growth and developmental milestones" over one year after the vaccination and onset); *accord* Ex. 17 at ¶ 10 (Dr. Giguere's affidavit).

My conclusion encompasses Petitioners' allegations of psychological distress. Although psychological distress due to a vaccine injury can be a reasonable and related sequela of some injuries, *this* kind of injury (which is insidious and often not characterized by painful symptoms), coupled with the fact that it occurred to a very young child, is not one that is likely to involve such sequela in the first place. It is simply unlikely that ITP in a minor would be associated with subsequent psychological effects sufficient to satisfy the severity requirement. *Wright v. Sec'y of Health & Hum. Servs.*, 2019 WL 1061472, at *11 - 13 (Fed. Cl. Spec. Mstr. Jan. 18, 2019) (finding no contemporaneous medical record documentation of the alleged psychological effects, and that a later-retained expert's opinion was "conclusory" and based on parents' assertions), *reversed on other grounds*, 146 Fed. Cl. 608 (2019), *remanded*, 2020 WL 6281782 (Fed. Cl. Spec. Mstr. Sept. 25, 2020), *reversed*, 22 F.4th 999 (Fed. Cir. 2022). Similarly, here, the medical records do not document any concerns, and to the contrary, indicate that E.A.F. was developing normally.[9]

---

[9] I also recognize Petitioners' assertion that E.A.F.'s repeated blood draws were "traumatic." Pet. Opp. at n. 4. But they have not distinguished their case from *Wright*, in which the Federal Circuit held that such blood draws in a similarly-aged child did not fulfill the severity requirement. *Wright*, 22 F.4th 999, 1007 (characterizing such blood draws as "routine").

The only other evidence of severity pointed to by Petitioners is the fact that vaccination was not recommended by later treaters. In particular, a hematologist determined that E.A.F. should not receive further vaccines (except flu) for over six months – based on the reasoning that his IVIg infusion may prevent a "full response." Ex. 2 at 14, 48; *accord* Ex. 6 at 76 (pediatrician's immunization records).[10] E.A.F.'s pediatrician also granted a longer exemption from MMR vaccines. Ex. 6 at 45, 64; *see also* Ex. 17 at ¶ 12 (attesting that this was "medically prudent").

However, these kind of treatment recommendations do not establish severity either. Petitioners have only asserted "*concern* about the impact [these vaccine restrictions] *might have* on [E.A.F.'s] health," Ex. 13 at ¶ 11 (emphasis added). This falls short of any actual demonstrated impact, as *Wright* would require. *See, e.g.*, *Michie*, 2023 WL 10410004, at *7-8 ("lingering risk of a future injury after a second vaccination… is not evidence of 'effects within the patient'"); *Leming*, 2022 WL 3371016, at *8 (Fed. Cl. Spec. Mstr. Jan. 26, 2022) (concluding that a restriction against further vaccines did not constitute evidence that ITP "or any related immunodeficiency persisted for more than six months").

## Conclusion

For the reasons explained above, Petitioners have failed to establish that E.A.F. suffered from ITP or its residual effects or complications for over six months, under the meaning of Vaccine Act Section 11(c)(1)(D). Accordingly, this claim must be dismissed. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[10] *But see* Resp. Response at 2, and above summary of the medical records, noting that Petitioners had previously instituted an alternative schedule which spaced out E.A.F.'s vaccinations.

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.